IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ANGELA BANKS, o/b/o D.H.,          §
                                   §
        Plaintiff,                 §
                                   §
v.                                 §     CIVIL ACTION NO. H-16-1302
                                   §
NANCY A. BERRYHILL,[1]             §
ACTING COMMISSIONER OF THE         §
SOCIAL SECURITY ADMINISTRATION,    §
                                   §
        Defendant.                 §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[2] are Plaintiff's Motion for Summary Judgment (Doc. 16) and Defendant's Cross-Motion for Summary Judgment (Doc. 14). The court has considered the motions, the responses, the administrative record, and the applicable law. For the reasons set forth below, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's motion.

## I. Case Background

Angela Banks, on behalf of D.H. ("Plaintiff"), filed this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding

---

[1]    Carolyn W. Colvin was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

[2]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. <u>See</u> Doc. 17, Ord. Dated Aug. 29, 2016.

Plaintiff's claim for supplemental security income under Title XVI of the Social Security Act ("the Act").[3]

## A. Factual Background

### 1. Medical Records

D.H. was born on December 22, 2003, and was eight years old on September 12, 2012, the date the application was filed.[4] D.H. was diagnosed with asthma when he was eighteen months old.[5] The alleged disability onset date was December 22, 2003, the day D.H. was born.[6]

D.H. was hospitalized from January 14, 2010, to January 16, 2010, after displaying symptoms of shortness of breath, fever, cough, and congestion.[7] It was noted that D.H. had not taken his medication for a week.[8] Upon discharge, D.H.'s condition had improved; D.H. was instructed to continue with albuterol nebulizer treatments.[9]

On January 24, 2011, D.H. saw Gabriel Neal, M.D. ("Dr. Neal") to treat his asthma.[10] D.H. was experiencing trouble breathing, a

---

[3]     See Doc. 1, Pl.'s Compl.

[4]     See Tr. 13.

[5]     See Tr. 280, 381.

[6]     See Tr. 159.

[7]     See Tr. 331-34.

[8]     See Tr. 331.

[9]     See Tr. 334.

[10]    See Tr. 300-01.

cough, and wheezing, and Dr. Neal found that D.H. had asthma with acute exacerbation.[11]  D.H. was prescribed prednisolone, a corticosteroid, for five days.[12]  On March 10 and 28, 2011, Dr. Neal again diagnosed D.H. with asthma with acute exacerbation.[13]  At these appointments, D.H. reported that he was experiencing the same symptoms which resulted in missed school, and D.H. was prescribed prednisolone for seven days each time.[14]  It was noted that exacerbation of D.H.'s symptoms occurred when he had an allergic reaction, when seasonal allergies were triggered, or when he had a respiratory infection.[15]

D.H. also sought treatment from Dr. Barry R. Paull, M.D., ("Dr. Paull") of the Allergy Associates of the Brazos Valley.[16] Pulmonary function tests performed by Dr. Paull on March 21, 2011, "showed marked decline in both small and large airway flows with marked improvement post bronchodilator" which Dr. Paull stated was "indicative of severe reactive airway disease."[17]  D.H. was also tested for allergies, and the results showed reactions to a variety of environmental allergens, including dust mites, mold, and weed

---

[11]   See Tr. 300.

[12]   See id.

[13]   See Tr. 296-99.

[14]   See id.

[15]   See id.

[16]   See Tr. 305-06.

[17]   Tr. 306.

and tree pollens.[18] Dr. Paull diagnosed D.H. with severe asthma and allergic rhinitis, prescribing multiple medications and recommending a course of immunotherapy to treat his allergies.[19]

Siby Moonnumakal, M.D., ("Dr. Moonnumakal"), a pulmonologist at the Texas Children's Hospital Pulmonary Medicine and Asthma Center, saw D.H. on April 28, 2011.[20] D.H. was wheezing at the time of the appointment and reported that he was coughing during the night and was experiencing weekly asthma attacks.[21] His wheezing subsided when given a breathing treatment.[22] D.H. participated in activities such as soccer, basketball, and football, but "had trouble running and playing" and had not tried using a breathing treatment prior to exercise.[23] D.H.'s lung function was assessed with a spirometry, which revealed a "severe obstruction with a substantial and significant bronchodilator response."[24] Accordingly, Dr. Moonnumakal concluded that D.H.'s asthma "seem[ed] moderate-severe" and that it "ha[d] been poorly controlled."[25] D.H. was prescribed prednisone for five days but was told to discontinue

---

[18] See id.

[19] See id.

[20] See Tr. 302-04.

[21] See Tr. 302.

[22] See id.

[23] Id.

[24] Tr. 303.

[25] Id.

taking it if his symptoms improved.[26]

On August 24, 2011, D.H. visited Dr. Neal for a health check-up, where it was reported that D.H. had no problems at school and that he partook in organized sports, including basketball and football.[27]

D.H. presented to David Damian, M.D., ("Dr. Damian") on December 9, 2011, with acute exacerbation of his asthma over the previous few days, including symptoms of wheezing and coughing.[28] D.H. was prescribed Medrol, a corticosteroid.[29]

On December 12, 2011, D.H. returned to Dr. Neal complaining of acute exacerbation of his asthma.[30] Dr. Neal noted that D.H. was having difficulty breathing due to his respiratory allergies and his noncompliance with taking Xopenex, but found that his breathing was "non-labored" and that both lungs sounded clear.[31]   D.H. reported that he was coughing to the point of vomiting at night.[32]

On March 1, 2012, D.H. returned to Dr. Moonnumakal and stated that he sometimes missed school or left early due to coughing.[33]

---

[26]   Id.

[27]   See Tr. 293-94.

[28]   See Tr. 291-92.

[29]   See Tr. 291.

[30]   See Tr. 289.

[31]   See id.

[32]   See id.

[33]   See Tr. 266.

D.H. reported that he played basketball, but needed his inhaler frequently while playing.[34]  Additionally, D.H. would have bouts of "on and off coughing and wheezing."[35]  When D.H. woke up in the morning, he experienced sneezing and mucus.[36]  At this appointment, D.H.'s lungs sounded clear with no respiratory distress.[37]  Dr. Moonnumakal concluded that D.H. had "fair control" over his allergic rhinitis, but his asthma was "moderate-severe" and "poorly-controlled."[38]  Dr. Moonnumakal set a plan to more effectively control D.H.'s symptoms which included altering his medication, avoiding tobacco smoke and air pollution, and promoting smoking cessation by his mother.[39]

On March 22, 2012, Dr. Paull noted that D.H.'s symptoms were "maintained" over the previous year but that he experienced "occasional flare-ups" with symptoms of wheezing and shortness of breath "when it rain[ed]."[40]

On May 22, 2012, D.H. sought emergency treatment at St. Joseph Regional Health Center, complaining of a fever, cough, and

---

[34]   See id.

[35]   See id.

[36]   See id.

[37]   See Tr. 267.

[38]   Tr. 268.

[39]   See id.

[40]   Tr. 368.

constipation.[41]  D.H. was found to have no symptoms of respiratory distress or wheezing.[42]  D.H. was discharged the same day.[43]

On September 7, 2012, D.H. went to the hospital because of respiratory distress.[44]  Angela Banks, D.H.'s mother, ("Banks") explained that they had tried albuterol nebulizer treatments and inhaler with little success.[45]  It was noted that D.H. had been hospitalized three times for asthma attacks, but not during the previous year.[46]  Banks reported that D.H. had been receiving allergy shots twice a week, visited his primary care physician five or six times in the preceding year, and had been prescribed oral corticosteroids at each of those appointments.[47]  Upon examination, D.H. showed signs of respiratory distress, including wheezing, and was diagnosed with rhinovirus and asthmaticus.[48]

D.H. was discharged from the hospital on September 10, 2012, and was readmitted on September 11, 2012, after experiencing "worsening of his status asthmatic state."[49]  An examination of

---

[41]     See Tr. 336-39.

[42]     See Tr. 337.

[43]     See Tr. 338.

[44]     See Tr. 276-82.

[45]     See Tr. 280.

[46]     See id.

[47]     See Tr. 277.

[48]     See Tr. 278, 280.

[49]     Tr. 308-09.

D.H.'s lungs showed bilateral coarse wheezing.[50]  In conjunction with these hospitalizations, D.H. underwent two x-rays of his chest.[51]

On September 7, 2012, an x-ray showed bilateral hyperinflation; on September 11, 2012, an x-ray showed lungs that were "well expanded and clear."[52]  D.H. was treated using steroids, nebulizer treatments, and oxygen, and was discharged on September 12, 2012.[53]

On September 27, 2012, D.H. visited Alma Chavez, M.D., ("Dr. Chavez"), a pulmonologist, as a follow-up to his hospitalization.[54] Dr. Chavez noted that D.H. was frequently absent from school and that he would wake up several times every night due to his asthma.[55] On this date, a spirometry was performed that was "normal . . . without evidence of air flow limitation."[56]  Dr. Chavez concluded that D.H. had "moderate to severe persistent asthma."[57]

D.H. returned to Dr. Chavez on October 25, 2012, where D.H. reported that he had not been absent from school since the last

---

[50]    See Tr. 308.

[51]    See Tr. 322-23.

[52]    Id.

[53]    See Tr. 309.

[54]    See Tr. 381-84.

[55]    See Tr. 381.

[56]    Tr. 383-84.

[57]    Tr. 383.

appointment, and that there had been "a significant improvement in [his] symptoms."[58]   The new treatment prescribed by Dr. Chavez allowed D.H. to sleep through the night.[59]   As a result, he only experienced coughing or mucus in the morning.[60]   D.H.'s spirometry report was normal with "no significant changes" from the test performed a month earlier.[61]

D.H. continued to visit Dr. Neal regarding his asthma in late 2012 and early 2013.   On December 17, 2012, D.H. was instructed to continue taking Advair, a medication that his mother believed had been discontinued.[62]   D.H.'s symptoms included wheezing and coughing at night, two-to-three times per week.[63]   Dr. Neal prescribed prednisolone for twelve days.[64]   At D.H.'s appointment on January 11, 2013, Dr. Neal classified D.H.'s asthma as "[m]ild persistent," and it was reported that D.H. was only experiencing symptoms when he exercised.[65]   On January 21, 2013, D.H. reported to Dr. Neal that his symptoms were "normally controlled" but that he had experienced symptoms over the previous weekend, including coughing at night and

---

[58]    Tr. 386.

[59]    See id.

[60]    See Tr. 387.

[61]    Tr. 385.

[62]    See Tr. 401.

[63]    See id.

[64]    See id.

[65]    See Tr. 399.

wheezing.[66]  D.H. was diagnosed with an asthma exacerbation and prescribed prednisolone for seven days.[67]  On May 8, 2013, D.H. stated that he was experiencing his symptoms, which included coughing at night, at a rate of two-to-three times a week.[68]  D.H.'s lungs sounded clear with a prolonged expiratory phase; D.H. was diagnosed with acute asthmatic bronchitis and prescribed prednisone.[69]

Dr. Paull performed a pre-bronchodilator spirometry test on September 3, 2013, which revealed a FVC value of 1.25 and a FEV1 of .95.[70]  D.H.'s FEV1 was forty-six percent of his predicted value of 2.05.[71]  D.H. was experiencing difficulty breathing and not tested post-bronchodilator at this appointment.[72]  Dr. Paull continued to treat D.H. for allergies, noting on September 9, 2013, that he should resume twice-weekly allergy shots.[73]

D.H. presented at the emergency room at St. Joseph's Regional Health Center on September 18, 2013, due to asthma exacerbation.[74]

---

[66]    Tr. 397.

[67]    See id.

[68]    See Tr. 438.

[69]    See id.

[70]    See Tr. 499.

[71]    See id.

[72]    See Tr. 496, 499.

[73]    See Tr. 487.

[74]    See Tr. 452-57.

D.H. was diagnosed with asthma and seasonal allergies, prescribed prednisone for five days, and discharged.[75]  D.H. returned to the emergency room at St. Joseph's on November 19, 2013, complaining of chest tightness, wheezing, and a cough.[76]  Upon examination, it was found that he had wheezing and a cough, but showed "no signs of [respiratory] distress."[77]  D.H. was treated with nebulizers and steroids, which improved his condition, and he was diagnosed with asthma with bronchitis.[78]  D.H. was prescribed a ten-day course of Orapred (prednisolone).[79]

### 2.  School Records

The records provided from Bonham Elementary, from August 27, 2012, through February 1, 2013, reflect that D.H. was tardy ten times, left early eleven times, was absent with no excuse eight times, and was absent with an excuse eleven times.[80]  In his health records, his medications were listed, with the instruction that Xopenex and Advair were to be given on an as-needed basis.[81]  The records also reflected several nurse's office visits from August

---

[75]  See Tr. 456.

[76]  See Tr. 445-51.

[77]  Tr. 446.

[78]  See Tr. 450.

[79]  See Tr. 451.

[80]  See Tr. 359, 410-11.

[81]  See Tr. 360.

31, 2012, through October 2, 2012, where he was either dismissed to his mother or sent back to class.[82]

In the first half of the 2012-2013 school year, D.H.'s grades ranged from Cs to As.[83] Some of his teachers noted that his conduct was excellent or satisfactory, while others said it needed improvement.[84] By the end of the year, D.H. had passing grades and was promoted to fourth grade.[85] Behavioral records showed that he had altercations with several other students throughout the school year.[86]

On January 31, 2014, when D.H. was in fourth grade, a Section 504 report was completed by a committee.[87] The report highlighted D.H.'s asthma, which the committee found to "substantially limit" his learning abilities.[88] Due to his asthma, D.H. was given accommodations including extended testing time, peer assistance, and re-teaching of difficult concepts.[89] The committee found that D.H. needed these accommodations due to his lower-than-usual grades

---

[82]    See Tr. 361.

[83]    See Tr. 412.

[84]    See id.

[85]    See Tr. 259.

[86]    See Tr. 413-14.

[87]    See Tr. 459-60.

[88]    Tr. 459.

[89]    See Tr. 460.

and frequent absences.[90]  His grade reports from June 2014 indicated that D.H. was absent twenty-two days and received passing grades in all of his classes for the 2013-14 school year.[91]

## B.  Application to Social Security Administration

Plaintiff protectively applied for supplemental security income benefits on September 12, 2012.[92]

### 1.  Disability and Function Reports

Banks completed disability reports on September 13, 2012, and January 17, 2013, where she reported that D.H. had asthma.[93]  In a later disability report dated February 6, 2013, D.H.'s condition was "worse" because he needed to resume steroids and his lungs were inflamed.[94]  The report disclosed that D.H. had to utilize his inhaler in order to physically exert himself or participate in physical education at school.[95]  In a disability report dated April 2, 2013, it was reported that D.H.'s health was declining, which caused him to be frequently absent from school; additionally, he still required his inhaler to participate in physical activities or

---

[90]    See id.

[91]    See Tr. 259.

[92]    See Tr 159-69.

[93]    See Tr. 182-90, 199-206.

[94]    See Tr. 207-14.

[95]    See Tr. 212.

spend time outside.[96]

On September 13, 2012, Banks submitted a function report.[97] She reported that D.H. had no problems seeing, hearing, speaking, communicating, learning, behaving properly, cooperating, taking care of himself, or focusing.[98]  Banks addressed D.H.'s physical condition, opining that his condition prevented him from running, throwing a ball, or swimming, but that he could walk, ride a bike, jump rope, roller skate, use scissors, work video game controls, and dress or undress dolls or action figures.[99]

### 2. State Agency Reports

A state agency report was completed by Patricia Nicol, M.D., ("Dr. Nicol") on November 30, 2012, in conjunction with the initial determination.[100]  Dr. Nicol found that D.H.'s asthma was a severe, medically determinable impairment, but it did not meet or medically equal Listing 103.03.[101]  In the evaluation of D.H.'s functional equivalency, Dr. Nicol determined that he had a marked limitation in the domain of health and physical well-being, but no limitations

---

[96]   See Tr. 227.

[97]   See Tr. 171-81.

[98]   See Tr. 171-78.

[99]   See Tr. 175.

[100]  See Tr. 74-82.

[101]  See Tr. 78.

14

in the other domains.[102]  Therefore, Dr. Nicol concluded that D.H.
did not functionally equal the Listings of the regulations[103] (the
"Listings") and was found not disabled.[104]

Another state agency report was completed in conjunction with
the reconsideration by Monica Fisher, M.D., ("Dr. Fisher") on
February 27, 2013, where she also found that D.H.'s asthma was a
severe, medically determinable impairment that did not meet the
Listings.[105]  Dr. Fisher came to this conclusion because D.H. did
not have enough hospital or emergency room care, he did not have a
baseline wheeze, or documentation showing frequent steroid use.[106]
In terms of functional equivalency, Dr. Fisher concluded that D.H.
had no limitation in interacting and relating with others; less
than a marked limitation in the domains of acquiring and using
information, attending and completing tasks, moving about and
manipulation of objections, and caring for himself; and a marked
limitation in the domain of health and physical well-being, citing
his medical records.[107]  As a result, D.H. did not functionally
equal the Listing and was found not disabled.[108]

---

[102]    See Tr. 78-79.

[103]    20 C.F.R. Pt. 404, Subpt. P, App. 1.

[104]    See Tr. 79.

[105]    See Tr. 84-95.

[106]    See Tr. 92.

[107]    See id.

[108]    See Tr. 92-93.

### 3. Treating Doctors' Evaluations

On August 7, 2013, Dr. Chavez completed a childhood disability evaluation form.[109]  In evaluating the six domains, Dr. Chavez found that D.H. had no evidence of a limitation in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, or caring for himself, but that he had a marked limitation in the domain of health and physical well-being.[110]  Dr. Chavez discussed D.H.'s asthma, stating that: it was worse in the winter; his spirometry showed normal FEV1 levels but a lower FEV1/FVC ratio; when he was feeling well he could go to school and partake in his physical education classes; his parents' smoking "play[ed] a role in his disease severity" and despite his treatments, he had "frequent exacerbations."[111]

Dr. Chavez completed another childhood disability evaluation form on March 27, 2014, where she made similar findings.[112]  She again concluded that D.H. had a marked limitation in the domain of health and physical well-being, but no limitation in any other domain.[113]  In the evaluation, Dr. Chavez noted his "frequent urgent

---

[109]    See Tr. 441-42.

[110]    See Tr. 441.

[111]    Tr. 442.

[112]    See Tr. 468-69.

[113]    See Tr. 468.

16

emergency room visits" even though he was taking a variety of medications daily and reported that his spirometry performed on that date showed "mild to moderate obstruction with [an] FEV1/FVC ratio of 68 [and an] FEV1 of 1.56."[114] Also on March 27, 2014, Dr. Chavez completed a form where she considered whether D.H. met the criteria described in the Listings for asthma.[115] Dr. Chavez found that he met Listing 103.03 for asthma because D.H. had attacks in spite of prescribed treatment requiring physician intervention occurring at least once every two months or at least six times a year, where each inpatient hospitalization for longer than twenty-four hours counted as two attacks and it was evaluated on at least a twelve-month consecutive basis.[116] On August 12, 2014, Dr. Chavez completed an onset date questionnaire, stating that she had treated D.H. since September 27, 2012.[117] Her opinion was based on direct observation and treatment of D.H.[118]

Dr. Paull also completed a form on July 17, 2014, evaluating whether D.H. met the Listing 103.03.[119] Dr. Paull found that D.H. met the Listing because he had asthma with a FEV1 equal to or less

---

[114]    Tr. 469.

[115]    See Tr. 471-72.

[116]    See Tr. 471.

[117]    See Tr. 505.

[118]    See id.

[119]    See Tr. 503.

17

than the value provided in the table.[120]

### 4. Teacher Evaluations

Tracy Wager ("Wager") filled out a teacher questionnaire on September 27, 2012.[121] Wager saw D.H. during the entire school day for all subjects other than music, art, and physical education.[122] At the time of this questionnaire, D.H. was in third grade and was performing at a third-grade level for reading, math, and writing.[123] Wager reported no problems in domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself.[124] In terms of the domain of health and physical well-being, Wager wrote that D.H.'s asthma affected his attendance and that he had missed nine days of school in the preceding month.[125]

Wager submitted another questionnaire on February 6, 2013, evaluating D.H.'s functioning in the six domains, finding limitations in all areas except for moving and manipulating

---

[120] See id.

[121] See Tr. 191-98.

[122] See Tr. 191.

[123] See id.

[124] See Tr. 191-96.

[125] See Tr. 197.

objects.[126] Wager noted D.H.'s frequent absenteeism, stating that he was sometimes absent for "weeks at a time."[127]

In the domain of acquiring and using information, Wager found that D.H. had both slight and serious problems, which Wager attributed to D.H.'s absences that caused him to miss foundational learning that was necessary to master before progressing to more difficult material.[128] Wager evaluated D.H.'s functioning in the area of attending and completing tasks, indicating that he had daily slight, obvious, and serious problems.[129] Due to D.H.'s required visits to the school nurse for his breathing treatments, it was difficult for D.H. to re-focus after he returned to the classroom, and he became "easily distracted and very impatient" and would "often rush through his work just to be done."[130] In terms of interacting and relating with others, Wager did not indicate the frequency of the problems that D.H. experienced, but reported that he had slight, serious, and obvious problems in that domain.[131] It was noted that D.H. had been removed from the classroom a few times due to his behavior and a behavior sheet was sent home every day.[132]

---

[126] See Tr. 215-22.

[127] Id.

[128] See id.

[129] See Tr. 217.

[130] Id.

[131] See Tr. 218.

[132] See id.

19

Wager stated that D.H. was argumentative and easily angered when there was a difference of opinion with another student.[133]   In the domain of caring for himself, Wager found that D.H. had slight and obvious problems.[134]   D.H. would become easily frustrated, which would result in difficulty paying attention to Wager's re-teaching of material, and "sometimes" D.H. would "shut down."[135]

Wager noted that D.H. had issues with his health and physical well-being, specifically, that he would visit the nurse's office for a nebulizer or inhaler treatment "several times a day."[136] Wager noted that D.H.'s medical treatment made him "very active" and weather changes caused D.H. to be absent from school.[137]

On April 11, 2014, another one of D.H.'s teachers, Jean Wolff ("Wolff"), completed a teacher assessment.[138]   Wolff reported that D.H. experienced issues in five of the six domains.[139]   Wolff observed obvious, slight, and serious problems in the domains of acquiring and using information, interacting and relating with others, and attending and completing tasks.[140]   Very serious

---

[133]   See id.

[134]   See id.

[135]   Id.

[136]   Tr. 221.

[137]   Id.

[138]   See Tr. 462-66.

[139]   See id.

[140]   See Tr. 462-64.

problems were witnessed in the domain of attending and completing tasks.[141]   Wolff said it was necessary to utilize behavior modification strategies for D.H., such as removal from the classroom.[142]  D.H. also would "give up and want[] 'help' often."[143]

Wolff opined that, in the domain of moving about and manipulating objects, D.H. had a very serious problem with moving his body from one place to another and moving and manipulating things, and a slight problem with managing the pace of physical activities or tasks, showing a sense of his body's location and movement in space, integrating sensory input with motor output, and planning, remembering, and executing controlled motor movements.[144] In the domain of health and physical well-being, Wolff noted that D.H. had asthma, but it "[did not] really interfere with his success at school."[145]  D.H. took medication on a regular basis and utilized a nebulizer or inhaler for his treatments.[146]  Wolff did not answer the question of whether D.H. frequently missed school because of his illness.[147]

Defendant denied D.H.'s application at the initial and

---

[141]   See Tr. 463.

[142]   See Tr. 464.

[143]   Id.

[144]   See Tr. 465.

[145]   Tr. 466.

[146]   See id.

[147]   See id.

reconsideration levels.[148]  D.H. requested a hearing before an administrative law judge ("ALJ") of the Social Security Administration.[149]  The ALJ granted D.H.'s request and conducted a hearing on August 15, 2014, in Houston, Texas.[150]

## C.  **Hearing**

At the hearing, D.H. and Banks testified via videoconferencing.[151]  D.H. was represented by a disability advocate.[152]

D.H. testified that he was ten years old and about to begin the fifth grade.[153]  In fourth grade, he earned A's and B's in his classes.[154]  D.H. stated that his asthma limited his ability to play sports, but he enjoyed basketball and football.[155]  Because it was difficult for him to be outside, he and his friends normally played video games or watched movies inside.[156]  D.H. also enjoyed reading books.[157]  D.H. lived with his mother and brother, and he also had

---

[148]    See Tr. 74-96, 102, 108-11.

[149]    See Tr. 112-18.

[150]    See Tr. 53-73.

[151]    See id.

[152]    See Tr. 53-55.

[153]    See Tr. 56.

[154]    See Tr. 57.

[155]    See id.

[156]    See Tr. 57-58.

[157]    See Tr. 58.

a sister who lived in Austin.[158]

In response to his representative's questioning, D.H. told the ALJ that he would leave school early a few days every week due to his asthma.[159] D.H. testified that he missed ten to fifteen days of school per month due to his asthma.[160] Sometimes, D.H. would wake up in the middle of the night having difficulty breathing.[161] When he stayed home from school, D.H. would submit to breathing treatments or would use his inhaler.[162] If the breathing treatment was effective, D.H. would go to school.[163] If his treatments were ineffective, D.H. would go to the emergency room.[164] These emergency room visits happened about once or twice a year.[165]

D.H. also explained that he would visit the school nurse to use his hand-held inhaler twice a day.[166] If the inhaler did not work, then he would get a breathing treatment.[167] D.H. testified that he utilized this type of breathing treatment around six times

---

[158] See id.

[159] See Tr. 59.

[160] See Tr. 60.

[161] See id.

[162] See Tr. 60-61.

[163] See Tr. 61.

[164] See Tr. 60.

[165] See id.

[166] See Tr. 61-63.

[167] See id.

per year.[168]    D.H. testified that he and his mother both carried inhalers.[169]    D.H. stated that there were a few times each week where he required two treatments[170] in order to help him breathe.[171]

The ALJ also questioned Banks about D.H.'s living situation and his asthma.[172]    Banks testified that their household consisted of herself, D.H., and her other son, who was sixteen at the date of the hearing.[173]    Her older son would help D.H. with his asthma treatment when she was at work.[174]    Banks was a smoker.[175]

During the 2013-2014 school year, Banks testified that D.H. missed ten to fifteen days of school due to his asthma.[176] According to D.H.'s teachers, D.H. would frequently cough in class.[177]    However, D.H. could take care of himself and get along with others.[178]

---

[168]    See Tr. 62-63.

[169]    See Tr. 63.

[170]    In D.H.'s testimony, "breathing treatment" appears to be used interchangeably between some sort of treatment he said that he only did six times a year and using another type of treatment he used frequently at night.

[171]    See Tr. 64.

[172]    See Tr. 66.

[173]    See id.

[174]    See Tr. 66-67.

[175]    See Tr. 68.

[176]    See Tr. 67.

[177]    See Tr. 71.

[178]    See id.

Banks stated that D.H. had been treated with allergy shots, but due to limited insurance coverage, he could no longer receive the shots.[179] As a result, Banks noticed that D.H.'s condition was worse in the preceding five months, with new symptoms such as red eyes and a runny nose.[180]

Banks also testified that, as a side effect to his medication, D.H. experienced minor vomiting and swallowing episodes.[181] D.H. had difficulty catching his breath, on average, once or twice a month.[182] D.H. went to the doctor about once a month and underwent spirometry tests twice a year.[183]

**D. Commissioner's Decision**

On November 24, 2014, the ALJ issued an unfavorable decision.[184] The ALJ found that D.H. was a school-aged child at the time of filing and at the date of the decision, had not engaged in substantial gainful activity during the relevant period, and had a severe impairment, chronic asthma.[185] Plaintiff's severe impairment did not meet or medically equal any of the disorders described in

---

[179] See Tr. 67.

[180] See id.

[181] See Tr. 68-69.

[182] See Tr. 69.

[183] See Tr. 70.

[184] See Tr. 10-25.

[185] See Tr. 13.

the Listings.[186]  In particular, the ALJ considered Listing 103.03 in connection with Plaintiff's asthma.[187]  The ALJ discussed Listing 103.03[188] in great detail, addressing the criteria of that Listing, which required asthma, with either:

A. FEV1 equal to or less than the value specified in Table I of 103.02A; Or

B. Attacks (as defined in 3.00C) in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year.  Each inpatient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least twelve consecutive months must be used to determine the frequency of attacks; Or

C. Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with one of the following:

1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; Or

2. Short courses of corticosteriods that average more than five days per month for at least three months during a twelve month period; Or

---

[186]  See id.

[187]  See Tr. 13-14.

[188]  The criteria for Listing 103.03 was updated in 2016 , with an effective date of March 27, 2017.  See Revised Medical Criteria for Evaluating Respiratory System Disorders, 81 Fed. Reg. 37138, 37140 (Oct. 7, 2016)(to be codified at 20 C.F.R. 404, Subpt. P, App. 1); 20 C.F.R. 404 Subpt. P., App. 1. Listing 103.03 now requires "[a]sthma with exacerbations or complications requiring three hospitalizations within a 12-month period and at least 30 days apart (the 12-month period must occur within the period we are considering in connection with your application or continuing disability review).  Each hospitalization must last at least 48 hours, including hours in a hospital emergency department immediately before hospitalization."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.03. When referring to the Listing throughout this opinion, the court will be referring to the Listing criteria that were effective as of the date of the ALJ's opinion.

D. A growth impairment as described under the criteria in 100.00.[189]

The ALJ found that there was no evidence of attacks, a growth impairment, or low grade wheezing or absence of extended symptom-free periods requiring the use of bronchodilators with one of the required criteria in 103.03C.[190] Additionally, the ALJ looked at Plaintiff's spirometry test from September 2013, to see if he met the FEV1 level, but discredited the findings because the test was not performed while Plaintiff was stable and no post-bronchodilator testing was done.[191]

Because Plaintiff's impairment did not meet or medically equal the Listing, the ALJ considered whether Plaintiff's impairment functionally equaled the severity of the Listing.[192] In making this determination, the ALJ discussed Plaintiff's alleged symptoms, medical treatment, school records, teacher questionnaires, and ability to function in the six domains.[193] When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could be reasonably expected to produce the alleged symptoms.[194] Second, she evaluated the "intensity,

---

[189]    20 C.F.R. Pt. 404, Subpt. P, App. 1 (2014); Tr. 13.

[190]    See Tr. 13.

[191]    See Tr. 13-14.

[192]    See Tr. 14-24.

[193]    See id.

[194]    See Tr. 14.

persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] functioning," making a credibility finding for those symptoms that were not substantiated by objective medical evidence.[195]

Regarding Plaintiff's symptoms, the ALJ discussed Plaintiff's breathing issues, treatments, and the resulting attendance issues at school.[196] The ALJ concluded: "After considering the evidence of record, the undersigned finds that [Plaintiff's] medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below."[197] In support of this conclusion, the ALJ stated that the "record fails to support the allegations of ongoing and disabling symptoms associated with asthma."[198] She found that there was no medical evidence that Plaintiff's asthma required repetitive emergency treatment or hospitalization.[199] The ALJ also noted Plaintiff's noncompliance with treatment.[200]

---

[195]    See Tr. 14-15.

[196]    See Tr. 15.

[197]    Id.

[198]    See id.

[199]    See id.

[200]    See id.

The ALJ turned to a discussion of Plaintiff's medical treatment, including records from: the January 2010 and September 2012 hospitalizations; the May 2012, September 2013, and November 2013 emergency room visits; and the 2011-2013 doctor visits to treat his asthma.[201]   Additionally, the ALJ discussed Plaintiff's school records reflecting his absences and grades.[202]

The ALJ considered opinion evidence submitted from Dr. Paull, Dr. Chavez, and the state medical consultants.[203]   The opinion of Dr. Paull was given little weight because, the ALJ wrote, it was inconsistent with the record evidence as Dr. Paull failed to follow the regulations in performing the spirometry test.[204]   Dr. Chavez and the state agency medical consultant's opinions were given some weight, but the ALJ found that the medical records did not support some of their findings.[205]

In evaluating Plaintiff in the six functional equivalence domains, the ALJ found that Plaintiff had less-than-marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and health and physical well-being,

---

[201]    See Tr. 16-19.

[202]    See Tr. 17-18.

[203]    See Tr. 18-24.

[204]    See Tr. 18.

[205]    See Tr. 18-19.

and no limitation in caring for himself.[206]  The ALJ considered Plaintiff's school records, statements from Plaintiff's mother, and opinions submitted from Plaintiff's teachers.[207]

The ALJ concluded that Plaintiff had not been under a disability from September 12, 2012, through November 24, 2014, the date of the ALJ's decision.[208]

Plaintiff appealed the ALJ's decision, and, on February 22, 2016, the Appeals Council denied Plaintiff's request for review, thereby transforming the ALJ's decision into the final decision of the Commissioner.[209]  After receiving the Appeals Council's denial, Plaintiff sought judicial review of the decision by this court.[210]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: (1) the ALJ applied proper legal standards in evaluating the record; and (2) substantial evidence in the record supports the decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the

---

[206]    See 19-24.

[207]    See id.

[208]    See Tr. 24-25.

[209]    See Tr. 1-6.

[210]    See Tr. 1-4; Doc. 1, Pl.'s Compl.

ultimate burden of proving he is disabled within the meaning of the Act. <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991).

The regulations provide that a child's disability claim should be evaluated according to the following sequential three-step process: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has a medically determinable impairment or combination of impairments that is severe; and (3) if so, the child's impairment or combination of impairments meet, medically equal, or functionally equal the severity of a Listing. <u>See</u> 20 C.F.R. § 416.924(b)-(d). If the child's impairment or combination of impairments meets or medically equals the Listings, or functionally equals the Listings, and meets the duration requirement, the child is considered disabled. <u>See</u> 20 C.F.R. § 416.924(d)(1).

At the third step of the analysis, the Commissioner looks at whether a child's severe impairment or combination of impairments meets or medically equals any Listing. 20 C.F.R. § 416.924(b)-(d); 20 C.F.R. § 416.926a(a). If the child's impairment or combination impairments do not, then the Commissioner decides whether the child's severe impairment or combination of impairments functionally equals the Listing. The Commissioner evaluates the child's ability to function in the following six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about

and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. See 20 C.F.R. § 416.926a(b)(1). If a child's impairment results in "marked" limitations in two domains or an "extreme" limitation in one domain, that impairment is deemed functionally equal to a Listing. See 20 C.F.R. § 416.926a(a).

A "marked" limitation is one that seriously interferes with the child's ability "to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I). It is "more than moderate" but "less than extreme." Id. A child is said to have an "extreme" limitation if his impairment "interferes very seriously with [his] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I). In determining whether a child claimant has a "marked" or an "extreme" limitation, the Commissioner must review all of the evidence of record and "compare [the child's] functioning to the typical functioning of [same-aged children] who do not have impairments." 20 C.F.R. § 416.926a(f)(1); see also 20 C.F.R. § 416.926a(b).

## B.  **Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." Id. The Commissioner has the responsibility of deciding any conflict in the evidence.

Id. If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm. 42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999). In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless. Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits. Plaintiff asserts that the ALJ's decision contains the following errors: (1) the ALJ failed to properly weigh the medical evidence; and (2) the ALJ should have found that the impairment or combination of impairments functionally equaled a Listing.

### A. Medical Evidence

Plaintiff argues that the ALJ erred by not properly weighing the medical evidence, which resulted in a finding that Plaintiff

33

did not meet the Listing.  Plaintiff contends that the ALJ should have found that he met either Listing 103.02A, 103.02B, 103.03B, or 103.03C2.

**1.  Listing 103.03**

**a.  FEV1 Value**

Plaintiff contends that the spirometry test performed by Dr. Paull in September 2013 should not have been rejected by the ALJ because there was no requirement that Plaintiff be stable or that the test be performed again post-bronchodilator.  The Listings do require that a test be performed when a child is stable, but do acknowledge that "[w]heezing is common . . and does not preclude testing."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.00B.  Under the appendix to the regulations, it states that "[s]pirometry should be repeated after administration of an aerosolized bronchodilator under supervision of the testing personnel if the pre-bronchodilator FEV1 value is less than the appropriate reference value in table I or III, as appropriate. If a bronchodilator is not administered, the reason should be clearly stated in the report."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.00B.

At the time of the test, Plaintiff was experiencing some breathing difficulties, as noted by Dr. Paull.  However, in the spirometry report, Dr. Paull did not indicate that Plaintiff had a cough or wheeze.  Regardless of whether Plaintiff was actually

stable at the time of the test, no post-bronchodilator test was performed, and the record does not include a clear reason why such test was not performed. At the time of the test, Plaintiff was fifty-five inches tall and his FEV1 value pre-bronchodilator came back at .95, below the FEV1 value of 1.15 in Table I. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.02A, Table I. A post-bronchodilator test should have been performed in this situation. Additionally, Dr. Chavez and the state agency medical consultants did not find that Plaintiff met this Listing criteria. Other spirometry tests performed by Dr. Chavez in 2012, 2013, and 2014 indicated that he had normal FEV1 values above the Listing requirement. In Cain v. Barnhart, 193 F. App'x 357, 360 (5th Cir. 2006)(unpublished), the court found that the plaintiff did not meet the Listing because, even though on one occasion, his spirometry levels met the value in the table, the test was performed at a time of exacerbation, and [o]n most occasions, [the plaintiff's] measurements were well above the listing requirement." Therefore, the ALJ's decision to disregard the findings in this test is supported by substantial evidence.

### b. Asthma Attacks with Physician Intervention

In the alternative, Plaintiff states that he met the requirements for Listing 103.03 because his attacks required physician intervention at least once every two months or six times per year. Dr. Chavez indicated that he met this requirement for

the Listing in her report from March 27, 2014.

The ALJ must evaluate every medical opinion in the record and decide what weight to give each. See 20 C.F.R. § 404.1527(c). Generally, the ALJ will give more weight to medical sources who treated the claimant because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2); see also Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)(stating that the Fifth Circuit has "long held that 'ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment[s], and responses should be accorded considerable weight in determining disability.'")(quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996)(stating that medical source opinions must be carefully considered, even on issues reserved to the Commissioner).

The ALJ is required to give good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

> When the determination or decision . . . is a denial[,] . . . . the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the

> evidence in the case record[] and must be sufficiently
> specific to make clear to any subsequent reviewers the
> weight the adjudicator gave to the treating source's
> medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. The regulations require that,

when a treating source's opinion on the nature and severity of a

claimant's impairments "is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case

record," it is to be given controlling weight. 20 C.F.R. §

404.1527(c)(2); <u>see also</u> <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th

Cir. 2000); SSR 96-2p, 1996 WL 374188, at *1. When the ALJ does

not give a treating physician's opinion controlling weight, he must

apply the following five factors: (1) the "[l]ength of the

treatment relationship and the frequency of examination;" (2) the

"[n]ature and extent of the treatment relationship;" (3) the

relevant medical evidence supporting the opinion; (4) the

consistency of the opinion with the remainder of the medical

record; (5) the treating physician's area of specialization. 20

C.F.R. § 404.1527(c); <u>Newton</u>, 209 F.3d at 456.

Normally, a treating physician's opinion is given considerable

weight when making a disability determination, but "when good cause

is shown, less weight, little weight, or even no weight may be

given to the physician's testimony." <u>Myers</u>, 238 F.3d at 621 (5th

Cir. 2001). The Fifth Circuit has recognized the following

exceptions as "good cause" for disregarding a treating physician's

opinion: "statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise supported by evidence." Id. An ALJ may "reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is 'leaning over backwards to support the application for disability benefits.'" Scott, 770 F.2d at 485.

The ALJ gave Dr. Chavez's opinion some weight but found that her "statements regarding [Plaintiff's] having asthma attacks at the frequency required under section 103.03 is also inconsistent with the longitudinal record." Looking to the record, the court finds that the ALJ's statement is supported by substantial evidence. Plaintiff argues that there was physician intervention for asthma attacks six times between September 7, 2012, through January 21, 2013. Under the Listings, attacks "are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 3.00C. While Plaintiff's medical records show that he frequently visited the doctor during this period, not all of these visits were to treat asthma attacks. And, while it appears from the record that Plaintiff's hospitalizations from September 7, 2012, and September 11, 2012, may rise to the level of "attacks" as provided in the Listings, the only other

medical evidence from this period included "exacerbations" on December 13, 2012, and January 21, 2013 that required the use of corticosteriods. Medical appointments from September 27, 2012, October 15, 2012, and January 11, 2013, showed no evidence of asthma attacks. Additionally, the state agency consultants found that Plaintiff did not meet this criteria for the Listing. Therefore, the court finds that the ALJ's decision is supported by substantial evidence.

### c. Corticosteroids

Plaintiff alternatively contends that he meets the Listing for asthma under 103.03C2. In terms of corticosteroid use, the record reflects that Plaintiff was prescribed a short-term corticosteroid on the following occasions: January 24, 2011, for five days; March 10, 2011, for seven days; March 28, 2011, for seven days; April 28, 2011, for three to five days; December 9, 2011, as directed; December 17, 2012, for twelve days; January 21, 2013, for seven days; May 8, 2013, for five days; September 18, 2013, he was treated with a steroid and prescribed one for five days; and November 19, 2013, for ten days. On September 11, 2012, he was treated with a steroid while he was in the hospital for treatment.

While Plaintiff's prescribed corticosteroid may have averaged out to more than five days a month for three months at several points in time, there is no evidence of persistent low-grade wheezing between attacks or the absence of extended symptom-free

periods requiring daytime and nocturnal use of sympathomimetic bronchodilator. In the record, there are large gaps of time where Plaintiff was experiencing no respiratory distress or wheezing. In their reports from 2014, neither Dr. Chavez nor Dr. Paull found that Plaintiff met the Listing for 103.03C2, and the state agency medical consultants reports concurred. Therefore, the court finds that there is substantial medical evidence supporting the ALJ's decision.

## 2. Listing 103.02

Plaintiff additionally argues that the result of the test performed by Dr. Paull supports that Plaintiff met the requirements for Listing 103.02 in addition to Listing 103.03. Listing 103.02A (chronic pulmonary insufficiency) requires "[c]hronic obstructive pulmonary disease, due to any cause, with the FEV1 equal to or less than the value specified in table I corresponding to the child's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.02A. Listing 103.03B (chronic restrictive ventilatory disease) requires "the FVC equal to or less than the value specified in table II corresponding to the child's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 103.02B. Table I for Listing 103.02A also applied above in the determination of 103.03A. The FVC value for 103.02B from Dr. Paull's test was 1.25, which is equal to the value in table II. However, as explained, the spirometry test was properly rejected because no post-

40

bronchodilator test was performed.  Therefore, the court finds this argument to be without merit.

## B.  <u>Functional Equivalency</u>

Plaintiff also argues that the ALJ erred by not finding that he functionally equaled the Listing and by not considering all the functional impairments included in the evaluations by Plaintiff's teachers.  Plaintiff contends that he has marked limitations in the domains of attending and completing tasks and health and physical well-being.

Teacher evaluations may be used by the ALJ in deciding whether a child has a disability.  <u>Sambula v. Barnhart</u>, 285 F. Supp.2d 815, 824 (S.D. Tex. 2002)(citing 20 C.F.R. § 416.924(a)).  However, "[t]he regulations require that an impairment result from abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." <u>Lee o/b/o R.L. v. Commissioner, Soc. Sec. Admin.</u>, No. 11-CV-0910, 2013 WL 639060, at *4 (W.D. La. Jan. 29, 2013)(unpublished).  In making her decision, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." <u>Greenspan</u>, 38 F.3d at 237.

Here, the ALJ's decision shows that she considered the teacher's opinions, along with other school and medical records in making her determination that Plaintiff was not disabled. Plaintiff contends that the medical and school records show that he

had a marked limitation in the domain of attending and completing

tasks. The ALJ considered the problems noted by his teachers in

this area, including:

> In the questionnaire completed in February 2013,
> [Plaintiff's] teacher, Tracy Wager, indicated that
> [Plaintiff] required several breathing treatments daily,
> and had difficulty staying on tasks following his visits
> to the nurse's office (Exhibit 8E, page 3). [Plaintiff]
> was subsequently assessed as having serious difficulties
> in his ability to complete class/homework assignments,
> complete work accurately without careless mistakes and
> working without distracting others. [Plaintiff] was
> rated as having obvious problems in his ability to wait
> and take turns and changing from one activity to another
> without being disruptive (Exhibit 8E, page 8). In March
> 2014, [Plaintiff's] fourth grade teacher, also indicated
> that [Plaintiff] was displaying a very serious problem in
> respect to his ability to complete class/homework
> assignments, and work without distracting himself or
> others (Exhibit 18F, page 3).[211]

The ALJ discussed the visits to the school nurse, stating that they

were supported by the record, but found that Plaintiff had received

passing grades in the 2013/2014 school year and was allowed to

proceed to fifth grade. While the teacher evaluations showed that

D.H. had some serious problems in this area, neither his treating

physician, Dr. Chavez, nor the state agency medical consultants

found that he had a marked limitation in this area.

The court agrees with Plaintiff that the ALJ's decision that

he did not have a marked limitation in the area of health and

physical well-being was not supported by substantial evidence. The

ALJ reasoned that he did not have a marked limitation in this

---

[211]     Tr. 21.

domain because his parent continued smoking, there was some evidence of non-compliance with treatment, and Plaintiff was still doing well in school. However, the record shows that a treating physician, Dr. Chavez, and the state agency doctors both found marked limitations in this category. His teachers found that his asthma affected his learning abilities and caused frequent absences from school. The record reflects that Plaintiff was mostly compliant with his treatment and the fact that his parent continued to smoke was out of his control. However, while there was not substantial evidence supporting the ALJ's decision that Plaintiff had less than a marked limitation in the domain of health and well-being, this does not mandate a finding that Plaintiff functionally equals the Listing, because two marked limitations are required for that finding. Therefore, this error does not warrant remand of the case for reconsideration.

## IV. Conclusion

Based on the foregoing, the court **DENIES** Plaintiff's motion and **GRANTS** Defendant's.

**SIGNED** in Houston, Texas, this 8th day of May, 2017.

_____
U.S. MAGISTRATE JUDGE